

# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

March 1, 1961

Honorable Thomas C. Ferguson
Chairman, State Board of
Insurance
International Life Building
Austin, Texas

Opinion No. WW-1005

Re: Whether the State Board of
Insurance may promulgate
or approve rating plans which
insurance companies may
elect to use for modification
of basic automobile rates
promulgated by the Board.

Dear Sir:

Your letter requesting an opinion of this office is as follows:

"It has been proposed to the State Board of Insurance that it rescind the Texas Safe Driving Insurance Plan as a mandatory, prescribed plan and revert to the pre-1960 classifications which were based solely on (a) the age of the driver, (b) the normal use made of the automobile, and (c) the territory in which the automobile was principally garaged. The Board would then prescribe and promulgate rates for each class thus established. For brevity, such rates will hereinafter be referred to as 'basic rates.'

"It is proposed that the Board provide for modification of its 'basic rates' by one of these two methods: (1) Board approval of rate modification plans filed by insurers, or (2) Board prescription and promulgation of a rate modification plan.

"Subchapter A of Chapter 5, Texas Insurance Code, and more particularly Acts 1953, 53rd Legislature, page 64, Chapter 50, are cited as authority by which rate modifications can be effected under either of the methods stated above. If the filing procedure is used, only the companies making modification filings would be required to use the 'modified rates' produced by their respective rating plans. If the prescribing method is used, it is proposed that insurers be given

the option of accepting or rejecting the plan. Thus,
regardless of whether rate modifications are accom-
plished by filing or prescribing, any insurer could use
'basic rates' if it care to do so. Insurers would,
however, be forced to an election, so that it would not
be possible for the same insurer to write at 'basic
rates' and also at 'modified rates.'

"Any rate modification plan, whether filed or
prescribed, would be designed to encourage the preven-
tion of accidents and to take account of the peculiar
hazards and experience of individual risks. The 'modi-
fied rates' produced would not be prescribed or approved
if they were found to be excessive, inadequate, or un-
fairly discriminatory.

"We respectfully request your opinion as to
whether the Board may legally authorize the use of
'modified rates' through either of the two methods
stated above, each insurer having an option to use either
'basic rates' or 'modified rates' but not both."

In our opinion the Board is not authorized to pursue either of the
two proposed courses of action.

At the outset, we must make it clear that our opinion does not
deal with any concrete proposals, as none have been submitted. We
merely undertake to point out some of the features in the general pro-
posals outlined in your letter of request which, in our opinion, are
contrary to law.

Briefly stated, automobile rates of insurance, classification of
risks, and policy forms are fixed and promulgated by the State Board
of Insurance, Article 5.01, Texas Insurance Code,* and no company
may issue an automobile insurance policy "at premium rates which
are greater or less than, or different from, those approved by the
Board." Article 5.03. These provisions are the ingredients of a
"single rate" law where all companies must charge the same premium
for the same risk, rather than a competitive rate law. Gibbs v. United

---

*Unless otherwise specified, reference throughout shall be to the
Texas Insurance Code.

States Guarantee Co. , 218 S. W. 2d 522, (Civ. App. 1949, error ref. ). Proponents concede such proposals to be inconsistent with these provisions, but insist that the amendments to Article 5. 09 and the addition of Articles 5. 77 - 5. 79 in 1953 contemplate and permit just such methods.

The 1953 legislation referred to, Acts 1953, p. 64, amended portions of Subchapters A (pertaining to automobile rate regulation) and D (pertaining to Workmen's Compensation Insurance rate regulation) of the Insurance Code and enacted three new sections, 1, 1a, and 1b* which apply to and supplement not only the Automobile and Workmen's Compensation rating laws, but the Casualty rating laws contained in Subchapter B of the Code. Art. 5. 77; Sec. 11, Acts 1953, p. 64.

Article 5. 09 forbids insurance companies from making or permitting "any distinction or discrimination in favor of the insured having a like hazard, in the matter of the charge of premiums." Since its original enactment, this Article has carried a proviso:

> "provided that nothing in this Act shall be
> construed to prohibit the modification of
> rates by an experience rating plan designed
> to encourage the prevention of accidents and
> to take account of the peculiar hazards of
> individual risks, provided such plan shall
> have been approved by the Commissioner."

Acts 1927, p. 373, Sec. 8. This proviso, however, was itself conditioned on a further proviso that "only one such plan shall be approved for each form of insurance hereunder." Acts 1927, p. 373, Sec. 8.

Acts 1937, p. 671, extensively amended what is now Article 5. 01, incorporating provisions dealing with the subject of experience rating plans. No change was made in Article 5. 09, but clearly the power to author such experience rating plans rested exclusively with the Insurance Department after such amendment by virtue of the following language of the Act:

> "The Commissioner shall have the sole and

---

* These have been codified by Vernon's as Articles 5. 77 through 5. 79, respectively, of the Code and will be so referred to.

exclusive power and authority. . .to determine, fix, prescribe, and promulgate. . .rates of premiums to be charged and collected by all insurers. . .including fleet or other rating plans, designed to discourage losses from fire and theft and similar hazards and to take account of the peculiar hazards of individual risks, and an experience rating plan designed to encourage the prevention of accidents, and to take account of the peculiar hazards of individual risks, provided that only one such plan shall be fixed or promulgated for each form of insurance hereunder." Acts 1937, p. 671, Section 1.

The 1953 Act, with some additional elaboration, re-enacted Article 5.01 and Article 5.09 essentially as they were, but deleted the restriction on more than one plan. In addition, Articles 5.77 - 5.79 were added, 5.77 providing that the Board is:

". . .authorized and empowered to make or approve and promulgate premium rating plans designed to encourage the prevention of accidents, to recognize the peculiar hazards of individuals risks and to give due consideration to interstate as well as intrastate experience of such risks for Workmen's Compensation, Motor Vehicle and other lines of Casualty Insurance to be applicable separately for each class of insurance, or in combination of two or more of such classes. Such plans may be approved on an optional basis to apply prospectively, or retrospectively, and may include premium discount plans, retrospective rating plans or other systems, plans or formulas, however named, if the rates thereby provided are not excessive, inadequate or unfairly discriminatory. The Board shall also have authority to make or approve and promulgate such reasonable rules and regulations as may be necessary, not in conflict with provisions of this Act." Acts 1953, 53rd Leg., p. 64, ch. 50, sec. 1.

Article 5.78 provides:

"Before the Board of Insurance Commissioners approves class rates or rating plans, due consideration shall be given to all relevant factors to the end that no

> unfair discrimination shall exist in class rates or rating
> plans as they may affect risks of various size." Acts
> 1953, 53rd Leg., p. 64., ch. 50, sec. la.

Article 5.79 provides:

> "If for any form of casualty insurance affected
> by this Act more than one rating plan is approved for
> optional selection and application, the selection of the
> plan shall rest with the applicant." Acts 1953, 53rd
> Leg., p. 64, ch. 50, sec. lb.

We shall deal with two questions. The first is whether the 1953 amendments permit companies to file their own plan in this field, as suggested by one of the alternate proposals in your letter. Proponents of an affirmative answer to this question suggest that the use, by Acts 1953, p. 64, of terminology permitting the "approval" of rating plans indicates that companies may initiate their own rating plans, which the Board may approve or disapprove, an admitted departure from the previous practice. They also point to the deletion of the restriction formerly present in both Article 5.01 and Article 5.09 against more than one such rating plan as further evidence that the legislation contemplated company proliferation of multiform rating plans. The result would authorize each company to adopt its own form of automobile merit rating.

For several reasons, it is our opinion that the 1953 legislation does not permit such far-reaching changes, and that, as before, only the Board may initiate the rating plans mentioned in the Articles.

First, the amendment of 1953 was drawn recognizing the distinctive terminology of three separate rating laws, each of which the amendment was to complement.* The Automobile and Workmen's Compensation rating laws speak in terms of the Board fixing and promulgating rates** while the Casualty rating laws vest tne Board with authority to "approve" rates. Hence, it was quite reasonable for the Legislature in its 1953 enactment to use language that fitted all three laws.

Also the term "approve" may encompass rating procedures

---

* Automobile, Art. 5.01 - 5.12, Casualty, Art. 5.13 - 5.51,
Workmen's Compensation, Art. 5.55 - 5.68.
    ** Articles 5.01, 5.55

authored by the Board and is not limited to approval of proposals initiated by companies. In everyday conversation, rates fixed and promulgated by the Board are often referred to as Board "approved" rates, and indeed the Legislature has followed this same convention. Examples of such usage appear throughout the Automobile and Workmen's Compensation rating laws, but perhaps the most convincing usage appears in Article 5.03, wherein companies writing automobile insurance are required to use the exact rates "approved" by the Board. There can be no doubt that the reference to Board "approved" rates is to the rates actually fixed and promulgated by the Board for all companies in accordance with Article 5.01.

The suggestion that the use of the term "approved" permits companies to use their individual merit rating systems was met and countered in Gibbs v. United States Guarantee Co., supra, arising under the Casualty rating law. There the court held that even though the law spoke in terms of companies "filing" their own rates subject to Board "approval" the Board not only had the authority to fix absolute rates, but must do so.

Nor do the provisions of Article 5.09 referred to above permit companies to institute their own versions of rating plans. The language of the proviso in question authorizes nothing -- it simply purports to be interpretive of the scope of the balance of the enactment.

As pointed out above, Article 5.09, since its origin, has spoken of Board "approval" of modifying rating plans and it is clear that the reference to approval is, as in Article 5.03, to Board-authored plans and that the language of the proviso is controlled by Article 5.01, placing exclusive authority to promulgate rating plans in the Board. There is nothing to indicate that in the amendments of 1953, the Legislature intended to use the term "approved" in Article 5.09 in any sense different from that previously assigned.

Finally on this first point, the 1953 Act re-enacted Article 5.01, which, as before, states the central theme of automobile rate regulation -- uniform rates. It is difficult to believe that the Legislature intended to tamper with the previously-given exclusive authority of the Board to author such plan in view of the following language re-enacted into Article 5.01 by this measure.

"The Board shall have the sole and exclusive power and authority, and it shall be its duty to determine, fix, prescribe, and promulgate. . .any rating plans designed

to encourage the prevention of accidents."

Nor was there any intent to change the basic mechanisms of rate regulation in any of the three fields touched by the 1953 Act. The main and predominant purpose of this legislation was to make clear and to confirm the authority of the Board to permit retrospective experience rating plans. This is made clear from the history of the case of Oil Well Drilling Co. v. Associated Indemnity Corp., 153 Tex. 153, 264 S.W.2d 697 (1954.).

In 1943, the Board had promulgated what was known as a retrospective rating plan applicable to Workmen's Compensation Insurance policies. Premium rates in this field are fixed and promulgated by the Board, essentially in the same manner as automobile rates.* Under this plan, which was applicable to all companies writing this form of insurance, the insured or policyholder had the option of electing whether to come under the retrospective plan, as well as the privilege of electing between three alternate versions of retrospective rating.

In March of 1952, a Dallas County District Court in the above-mentioned case rendered a judgment which, in effect, held that the retrospective rating plan was invalid. In the very next session of the Legislature, H. B. 32, which culminated in Acts 1953, p. 64, was introduced. When the substantive language of the Act is considered, it is apparent that the principal purpose of the Act was to confirm to tne Board this authority it previously believed it already possessed. That the Act was to some measure prompted by doubts caused by the Dallas decision is seen in the language of the emergency clause that:

> "The fact the present rating laws possibly do not provide adequate authority in the Board of Insurance Commissioners to permit it to allow policyholders in Texas the full benefit of their own experience as is now commonly done in other jurisdictions, thus it making it difficult if not impossible for many business concerns to obtain necessary coverage at proper rates. . . ( created the emergency)."

---

* For an explanation of retrospective rating and its history, see the opinion of the Supreme Court in the Oil Well Drilling Co. case and the opinion of the Court of Civil Appeals, 258 S.W.2d 523.

At this point we have concluded that the first proposal in your letter, if given effect, would be in violation of the statutes of this State, for only the Board has authority to "fix and promulgate rating plans" and for the additional reason that the companies are not permitted to adopt their own individual rating plans in the automobile insurance field.

The second proposal, "Board prescription and promulgation of a rate modification plan," envisions that the companies "be given the option of accepting or rejecting" such a plan. No authority for such a proposal can be found in the articles devoted exclusively to automobile insurance rate regulation, and indeed seems to be prohibited by such articles; in particular, Articles 5.03 and 5.09. Proponents of such a proposal must and do rely on the language of Articles 5.77 - 5.79 referring to optional use of rating plans. In our opinion the option permitted by such articles cannot rest with the companies.

The Legislature specifically provided that the option of selection must rest with the "applicant" and this can only mean the person applying for the insurance. Proponents reason that the term "applicant" refers to the insurance company in the sense that they are applicants seeking approval of a rating plan of the type described in Article 5.77. Aside from the fact that we have hereinabove held that no such procedure is permissible under the automobile rating law, it is difficult to understand what meaning the Legislature intended to imply to Article 5.79 if proponents' reasoning be applied. Assuming the companies were authorized to file their own rating plans, subject to approval, there is no reasonable explanation for the Legislature repeating what would in this premise be obvious -- that the company has the "option" to determine whether it will take advantage of the privilege of filing their own rating plan.

If some portions of Article 5.77 did permit company-authored rating plans, the, at least, equal right of the Board to author such plans must be conceded. Ignoring Article 5.01 which provides that the Board has exclusive authority to promulgate rating plans and which was re-enacted by the very measure creating Article 5.77, Article 5.77 itself confers this very authority wherein it states that the Board is authorized to "make. . .and promulgate" premium rating plans. With respect to Board-authored plans, there is no respect in which the company could be considered as the applicant and hence, as the beneficiary of the option mentioned in Article 5.79.

But even aside from this process of elimination approach, it

appears that the term "applicant" refers to the policyholder.  As stated above, the 1953 Act came in the wake of the Dallas District Court's decision overturning the Board's retrospective rating plan in Workmen's Compensation Insurance.  The Board had provided several plans and in each instance the option of plan selection lay with the policyholder.  The optional aspect was a focal point of contention in the case.  It is not unreasonable to assume that legislation introduced to confirm a power previously exercised contemplates that once confirmed, that power will be exercised as before.

The construction that we place on the term "applicant" is consistent with common usage, for the person applying for insurance is often referred to as an applicant.  The same Legislature in 1953 in dealing with Workmen's Compensantion Insurance in a manner closely connected with the subject matter of Acts 1953, p. 64, used the terms "policyholder" and "applicant" interchangeably, Acts 1953, p. 716, sec. 1 (Art. 5.76).  The provisions of Articles 5.77 - 5.79 complement the Workmen's Compensation rating laws in the same manner as the automobile rating laws.  Sec. 2 of Acts 1953, p. 716, in amending Article 5.65 relating to the regulation of Workmen's Compensation premium rates, expressly uses the term "applicant for insurance."

Finally, your department has uniformly and without challenge, since the passage of Acts 1953, p. 64, promulgated optional rating plans in the automobile and Workmen's Compensation fields, which in every instance place such option with the prospective insured.

In such circumstances, we deem it appropriate to apply the rule of statutory construction that the interpretation of a statute by the administrative agency charged with its enforcement should be accepted if the statute be reasonably subject to such interpretation and such interpretation has been accepted without challenge over a long period of time. Texas Employer's Ins. Ass'n. v. Holmes, 145 Tex. 158, 196 S. W. 2d 390 (1946).

Some question has been raised whether the Safe Driving Insurance Plan is a method of "classification" rather than a rating plan of the character referred to in Articles 5.09, 5.77, 5.78, and 5.79. However, since we have disposed of your request on other grounds, there is no necessity to discuss this contention.

## SUMMARY

Insurance companies may not file for approval by the State Board of Insurance automobile merit rating plans intended for individual company use, nor is the Board authorized to promulgate such a plan or plans for optional use by the companies.

Very truly yours,

WILL WILSON
Attorney General of Texas

By _Fred B. Werkenthin_
Fred B. Werkenthin
Assistant Attorney General

FBW/pe

APPROVED:

OPINION COMMITTEE:

W. V. Geppert, Chairman
R. V. Loftin, Jr.
Elmer McVey
Jack N. Price
Marvin R. Sentelle

REVIEWED FOR THE ATTORNEY GENERAL
BY:
　　　Morgan Nesbitt